**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SHEILA M. HUGHES,           )
                             )
           Plaintiff,        )
                             )
         v.             )         No. 14 C 1883
                             )
CAROLYN W. COLVIN, Acting   )        Magistrate Judge Jeffrey Cole
Commissioner of Social Security,   )
                             )
           Defendant.     )
                             )

## MEMORANDUM OPINION AND ORDER

The Plaintiff, Sheila M. Hughes, seeks review of the final decision of the Defendant, Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1382c(a)(3)(A). Ms. Hughes asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming it.

## I. PROCEDURAL HISTORY

Ms. Hughes applied for SSI on July 30, 2010, alleging disability since July 2, 2003 due to Chronic Obstructive Pulmonary Disease ("COPD"), sleep apnea, diabetes, depression, vision impairment and back pain. (Administrative Record ("R.") 15, 17, 24, 35). Her application was initially denied on December 13, 2010 and further denied upon reconsideration on December 2, 2011. (R. 15). Ms. Hughes made a timely request for hearing on January 12, 2012. (R. 15). A hearing was held and presided over by an Administrative Law Judge ("ALJ") on October 2, 2012 where Ms. Hughes, represented by counsel, testified (R. 15, 34-53). No medical personnel testified at the hearing. On November 28, 2012, the ALJ issued a decision denying her SSI claim.

On February 12, 2014, the decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Ms. Hughes' request for review. (R. 1). Ms. Hughes then appealed the Commissioner's decision to District Court for judicial review under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

Prior to the application at issue here, Ms. Hughes applied for SSI on October 18, 2006. (R. 15). That application was denied on March 7, 2007, denied again on August 10, 2007, and, after a hearing, that denial was affirmed on December 10, 2009. (R. 15).

## II. THE EVIDENCE

### A. The Vocational Evidence

Ms. Hughes was fifty-eight years old at the time of the ALJ's decision (R. 37). She lives with her adult daughter and young grandson. (R. 37-38). She completed high school and two years of college. (R. 37). Ms. Hughes previously worked as a parking lot attendant for Chicago State University in 2003, letting in students and staff to park their cars and then taking their payment when they left. (R. 18, 45). She lost this job after two weeks when she broke her foot and could not return "for a couple months." (R. 45). The school was unable to save the position for her. (R. 45).

Prior to that, Ms. Hughes also worked as an assistant security officer at Chicago Public Schools for approximately 10 years, which required her to maintain order in the school's hallways and break up any fights among the students, among other tasks. (R. 19, 48-49, 421). She left this position after needing to take too much time off due to having stomach surgery. (R. 365). Other positions held included time as a custodian for the post office and as a cashier in the 1980s, but neither position was for more than a year. (R. 365).

Ms. Hughes did find some part-time work after filing her application, providing home health care to senior citizens for eight hours a week but resigned after only three months. (R. 17, 41-42). Other than this work with senior citizens, Ms. Hughes has not worked since July 2, 2003. (R. 15, 17, 421).

## B. The Medical Evidence

### 1. Dr. Carlton

On November 15, 2010, Ms. Hughes saw Dr. Charles Carlton for an Agency consultative examination. (R. 352). Dr. Carlton reviewed records from Cook County hospital between the dates of March 30, 2010 and July 6, 2010 and spent approximately 30 minutes with her. (R. 352). Dr. Carlton felt Ms. Hughes was reliable. (R. 352). Ms. Hughes reported a history of depression and noted the treatment she was receiving from the mental health center. (R. 355). Dr. Carlton noted she had a flat affect, but was alert and oriented as to time, place and person. (R. 355). He also noted that she could perform basic calculations and opined that she was capable of being responsible for managing her funds. (R. 355).

Dr. Carlton found that Ms. Hughes could go from sitting to standing without assistance and walk greater than fifty feet, even though her gait was rigid. (R. 353, 356). Her abdomen was soft, non-tender and with normal activity in bowel sounds. (R. 354). He found there was pain in her left knee, but other joints had painless range of motion and her lumbar spine showed a decreased range of motion. (R. 354-55, 359). He noted that she had moderate difficulty in both walking on her toes and squatting and arising, while there was mild difficulty with walking on her heels and tandem walking. (R. 357). He found no difficulty in the grip and motor skills of her hands. (R. 355, 357). He opined that she could safely lift, carry and handle objects over 20 pounds with both hands from her waist level and above. (R. 356).

## 2. Dr. Morrin

Also on November 15, 2010, the agency arranged for Ms. Hughes to see Dr. Patricia Morrin, Psy.D. for a mental status evaluation. (R. 364). Dr. Morrin spent approximately 30 minutes with Ms. Hughes and reviewed three documents relating to Ms. Hughes: Community Mental Health Consult Adult Mental Health Assessment dated June 11, 2007, Community Mental Health Consult Mental Services report dated April 23, 2010, and Community Mental Health Consult Mental Services report dated July 27, 2010. (R. 364). Dr. Morrin noted good hygiene and clean clothes, as well as good eye contact, good effort and a cooperative and polite attitude. (R. 364). Ms. Hughes arrived fifty minutes late and alone. (R. 364). Ms. Hughes reported feeling sad two to three times a week and experiencing anxiety about her own death for the last four years, but denied any thoughts of suicide. (R. 364-65). Her speech was relevant and coherent with a clear articulation, but her affect and mood were "slightly blunted" and "moderately depressed." (R. 366). Her thought process was "intact," but she would often think her name was being called or would see something "flash across." (R. 366).

Dr. Morrin reported that Ms. Hughes lives with her daughter and grandson. (R. 365). Ms. Hughes said she helps her daughter out with her grandson. (R. 366). Ms. Hughes can dress and clean herself, but sometimes requires assistance because her legs will have trouble with a slippery bathtub. (R. 365). Ms. Hughes had no set wake-up, meal, or bed times and ate three to four meals per day. (R. 366). During the day, Ms. Hughes washes dishes, sweeps and prepares meals on the stove and in the evening she watches TV or reads. (R. 365-66). Ms. Hughes has been divorced for over 30 years. (R. 365). She has three sons, in addition to her daughter, and two siblings that all live in surrounding areas. (R. 365). She communicated with these family members regularly and they got along well. (R. 365). Her relationship with her daughter was

"okay." (R. 365). She also maintained relationships with some long term friends and knew her neighbors well. (R. 365). She got along well with coworkers when she was working. (R. 365). She usually takes the bus and said she does not drive. (R. 366). Dr. Morrin diagnosed Ms. Hughes with "depressive disorder, [not otherwise specified]." (R. 366).

### 3. Dr. Mallick

On April 20, 2011, Ms. Hughes was seen by Dr. Naveed Mallick for a general exam. (R. 403). Dr. Mallick noted she had intermittent leg pain and stiffness on her right side. (R. 403). He found no clear bulge of her vertebrae and referred her to the plain clinic as well as a physical therapist for her lower right back pain. (R. 404). Ms. Hughes saw Physical Therapist Laurie Webb on July 27, 2011 pursuant to Dr. Mallick's referral for pain in her lower back and right leg.[1] (R. 405). Ms. Webb identified that Ms. Hughes had a history of arthritis, required assistance in her "prior functioning level," required used of a cane at home, and had an impaired endurance. (R. 406). Ms. Webb recommended a home exercise program to help with Ms. Hughes's "sciatica exacerbation." (R. 407). On August 17, 2011, Ms. Hughes again saw Dr. Mallick who noted she still had lower back pain, but felt it had improved. (R. 432).

### 4. Dr. Phillips

Ms. Hughes visited Dr. Laron Philips on October 31, 2011 for another consultative psychiatric evaluation. (R. 420). Ms. Hughes told Dr. Phillips she suffered from symptoms of depression and anxiety, such as helpless/hopelessness, tearfulness, insomnia, low energy, poor concentration, decreased appetite, and passive suicidal ideation. (R. 420). She indicated her symptoms started when she was let go from Chicago State in 2003 and the prolonged effect of unemployment has made her feel useless and unproductive. (R. 420). She reported insomnia that

---

[1] Ms. Webb notes in her "Final Report" that the referral was also for degenerative joint disease in her spine ("djd spine"), R. 405, but it is not clear whether Dr. Mallick actually found Ms. Hughes to have degenerative joint disease of the spine.

caused her to fall asleep during the day to the point where her daily living was adversely affected. (R. 420). She also reported taking Zoloft and suffering from sleep apnea, irritable bowel syndrome and diabetes. (R. 421). Her average day was spent at home with little routine or structure. (R. 421). She told Dr. Phillips about her family, including her siblings, children and grandson. (R. 421). She has a family history of depression and bi-polar disorder. (R. 421).

Dr. Phillips noted relevant answers to questions, neat grooming, appropriate dress, and cooperative, appropriate behavior. (R. 421). He found her speech clear, conversation adequate and no signs of delusions, confusions or hallucinations during the consultation. (R. 421). Her mood was "down" and affect was "dysphoric with a saddened quality." (R. 421).

Ms. Hughes identified the correct date, her correct birthdate and the correct location of Dr. Phillips's office. (R. 422). She provided a topical news item, identified former presidents and cities, performed basic math skills, demonstrated abstract thinking, identified the similarities between apples and oranges, had "adequate judgment and insight," and did not show an impaired cognitive function. (R. 422).

Dr. Philips found that her anxiety and depressive syndromes caused a moderate impairment in her "social, occupational, and interpersonal functioning." (R. 422). He diagnosed her with "Major Depressive Disorder, recurrent, moderate," anxiety, sleep apnea, irritable bowel syndrome and diabetes. (R. 422-23).

**5.      Dr. Hudspeth**

Dr. Donna Hudspeth, Psy.D., prepared a residual functioning capacity (RFC) assessment on behalf of the Agency based upon treating sources, the consultative examination report of Dr. Morrin, and previous office observations, but did not perform a consultative examination. (R. 381). She reviewed three treating sources: an intake at community mental health from June,

2007; a sleep study from Stroger Hospital from September, 2009; and records from UIC Hospital from 2006. (R. 381). Based upon these sources, Dr. Hudspeth found Ms. Hughes was moderately limited in certain abilities, namely: understanding, remembering and carrying out detailed instructions; interacting appropriately with the general public; responding appropriately to changes in the work setting; and setting realistic goals or making plans independent of others. (R. 392).

In her Functional Capacity Assessment, Dr. Hudspeth found Ms. Hughes to be depressed and anxious and could perform "simple one- and two-step tasks in the work environment within physical limitations." (R. 392). She also recommended that Ms. Hughes not have any dealings with the public, although she could interact with supervisors and co-workers and would respond to the structure of a work environment. (R. 392). Dr. Hudspeth also prepared a Psychiatric Review Technique that opined Ms. Hughes had a moderate limitation in "concentration, persistence and pace" and mild limitations in "daily living" and "social functioning." (R. 379).

**6.      Dr. Panagos**

On October 18, 2011, Ms. Hughes met with Dr. Alexander Panagos, M.D. for yet another consultative examination. (R. 415). Ms. Hughes stopped wearing her CPAP for her sleep apnea and was experiencing daytime somnolence. (R. 415). Ms. Hughes reported depression, hallucinations (both auditory and visual) and diabetes for which she took an ace inhibitor. (R. 416). Ms. Hughes reported experiencing back pain "for the better part of ten years" and she experienced it all day, every day, especially when the weather changed. (R. 415). The pain was a "six or seven" out of ten in severity. (R. 416). Dr. Panagos reported she could walk less than fifty feet or climb five or six stairs with a cane and could not run. (R. 416, 417). Dr. Panagos noted no deformities in her back or lumbar curvature. (R. 417). Although there was tenderness in her

lower lumbar vertebrae region, there was a normal range of motion and no trauma. (R. 417). She did not have difficulty getting on and off the table or up from the chair. (R. 417).

Ms. Hughes was alert and oriented, her memory was intact, and she had good concentration and attention span. (R. 418). She was polite and had a good demeanor (R. 418). Her hygiene and dress were acceptable and appropriate. (R. 418). Dr. Panagos noted five clinical impressions, including sleep apnea, irritable bowel syndrome, depression and diabetes. (R. 418).

### 7. Dr. Dow

Dr. Victoria Dow, M.D. provided a Physical Residual Functional Capacity Assessment based on the evidence in Ms. Hughes's file. (R. 384). Dr. Dow determined Ms. Hughes could lift or carry up to fifty pounds occasionally and twenty five pounds frequently. (R. 384). Dr. Dow also opined Ms. Hughes could sit for six hours in an eight-hour span and was unlimited in pushing or pulling. (R. 384). Dr. Dow found no postural, manipulative, visual, or communicative limitations. (R. 385-87). Dr. Dow recommended Ms. Hughes avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights. (R. 387). Dr. Dow noted that her opinion conflicted with that of Dr. Carlton, a consultative examiner, about how much weight Ms. Hughes could safely lift, as Dr. Carlton recommended only twenty pounds. (R. 389). Dr. Dow did not give controlling weight to Dr. Carlton because he was only an examining source and there was no objective evidence to support his assessment. (R. 389).

### C. The Administrative Hearing Testimony

Ms. Hughes, the only witness to testify at the Administrative Hearing, (R. 15, 34-53), testified that, although she used to, she does not take care of her grandson despite living with him and her daughter. (R. 39). She estimated she could walk "about a block" and stand in one place anywhere from five to ten minutes, but no more because of her pain and stiffness. (R. 39, 49).

Anything more than a block required her to stop and rest due to pain and fatigue. (R. 49-50). She could sit comfortably in a chair for 45 minutes to an hour. (R. 42). She claimed her internal physician, Dr. Mallick, prescribed her a cane a year before. (R. 39). The cane was not with her at the hearing, however, because she was running late and left it in the car in her haste. (R. 39). Otherwise, she used the cane both in and outside of her apartment. (R. 51-52).

Ms. Hughes testified that, prior to the closure of the Community Mental Health Center in July or August of 2012, she saw Dr. Bell for her depression three times over a six month period. (R. 39-40). Dr. Bell prescribed Zoloft, which she stopped taking about the same time as the center's closure when she ran out. (R. 40). The last time she saw Dr. Bell was right before the center closed. (R. 40). She claimed her internal physician indicated he would write her a prescription for Zoloft upon her next visit. (R. 40). Her depression led her to experience thoughts of her own death, as well as feelings of anxiety, agitation, and nervousness. (R. 51).

Other prescriptions included Metformin, Glipizide XL, Simvastatin, Enalapril, Pantoprazole, Ibuprofen, and Lantus insulin by other doctors. (R. 42-43). She took eighteen units of insulin and five milligrams of Enalapril per day. (R. 42-43). She testified that the Ibuprofen was prescribed by Dr. Mallick for back, hip and leg pain. (R. 43). She was prescribed an inhaler in the past, but was not at the time and had not used one since the spring of that year when she had bronchitis. (R. 46-47). She was prescribed Flonase. (R. 47). She had been diagnosed with "beginning stages" of cataracts, but there were no plans to operate on her eyes at the time. (R. 46).

Ms. Hughes was prescribed a CPAP machine for her sleep apnea, but she did not use it very frequently due to panic attacks. (R. 44). She napped or dozed off during the week due to her sleep apnea and diabetes, but the frequency varied. (R. 44, 48). Later, she testified to sleeping

five or six times a day for five to ten minutes at a time. (R. 50). The sleep apnea led to problems in her concentration and focus. (R. 50). She was instructed by her eye doctor not to drive because her sleep apnea caused her to fall asleep as a passenger, both in cars and on buses. (R. 51).

Her daily routine involved light cleaning and minor chores in her daughter's apartment. (R. 44). Chores included dusting, taking out the garbage, changing bedsheets, folding clothes, watching television, and some cooking. (R. 44). She testified she was only able to lift about five pounds, but also claimed she was able to pour a gallon of milk if she used her right hand. (R. 42). She claimed weakness in her left hand. (R. 42).

Ms. Hughes was employed between June and September of 2012 providing home care for senior citizens. (R. 41). She was paid $10.05 per hour and worked four hours a day two days a week. (R. 42). Her duties included cooking breakfast, bathing the senior citizen, making the bed, and mopping the floor and the kitchen. (R. 48). Ms. Hughes claimed the duties were "a bit much" and resigned from this job due to increased back pain, fatigue and trouble staying awake. (R. 41, 48). She described her duties from her jobs at Chicago State University and Chicago Public Schools prior to the application. (R. 45). She claimed the main reason she could not go back to working at the parking lot for Chicago State because she would not be able to stay awake long enough, but if it was busy enough, she would be able to stay awake. (R. 45). At CPS, she would have to sit often in between classes where she would have trouble staying awake. (R. 48-49). She wouldn't be able to go back to that job because she would not be able to break up fights among students and the frequent standing, walking or climbing stairs would be too much. (R. 49).

## D. The ALJ's Decision

The ALJ conducted the five-step sequential analysis to determine if Ms. Hughes was disabled since the date of the application, as required by 20 CFR 416.920(a). (R. 15). In the first step, the ALJ found that Ms. Hughes had not engaged in substantial gainful activity, as defined by 20 CFR 416.971 *et seq.*, since filing the application. (R. 17). Although Ms. Hughes did find some work assisting senior citizens, the ALJ determined the activity involved in that work did not involve "significant mental or physical activities" or earnings that would warrant a presumption of an ability to perform substantial gainful activity, noting that Ms. Hughes resigned because she had back pain and often fell asleep on the job. (R. 16-17).

In the second step of analysis, the ALJ found Ms. Hughes suffered from four medically determinable impairments ("MDIs"): COPD, sleep apnea, insulin dependent diabetes mellitus, and depression. (R.17). The ALJ found that three of the MDIs were "severe" under 20 CFR 404.1520(c), 20 CFR 416.920(c), and SSRs 85-28 and 96-3p: COPD, sleep apnea, and insulin dependent diabetes mellitus. (R. 17).

The ALJ found Ms. Hughes's MDI of depression was not "severe," but instead only "mild" pursuant to three of the four "Paragraph B" criteria from the "Listing of Impairments" in 20 CFR, Part 404, Subpart P, Appendix 1. (R. 20). The ALJ found that Ms. Hughes only had mild limitations in the first area, daily living. (R. 20). In support of this finding, the ALJ claimed that Ms. Hughes's complaints "appeared to be physical and related to her alleged intermittent back pain." (R. 20). The ALJ also noted that Ms. Hughes folds clothing, dusts, cooks, shops with her daughter and changed bedsheets as further support. (R. 20).

The ALJ found a mild limitation in the second area, social functioning, as well. (R. 20). In support, the ALJ noted she had an "okay" relationship with her daughter. (R. 20). The ALJ

also noted she had good relationships with her sons, siblings, long-term friends and neighbors and kept in touch with those that lived in surrounding states. (R. 20). Lastly, Ms. Hughes could take public transportation. (R. 20).

Ms. Hughes also had a mild limitation in the third functional area: concentration, persistence and pace. (R. 20). In support, the ALJ cited Dr. Phillips's observations that Ms. Hughes could cite a topical news item, identify former presidents, name three cities, and perform basic math tests and serial 7's from 100 correctly. (R. 20). The ALJ also noted that Dr. Phillips observed adequate abstract thinking, judgment and insight, knew the difference between apples and oranges and had normal attentiveness. (R. 20).

In the fourth area, decompensation, the ALJ noted that there was no evidence of any episodes of extended duration. (R. 20). Because the ALJ found only "mild" limitations in the first three areas and no episodes of decompensation, the ALJ concluded Ms. Hughes's MDI of depression was "nonsevere" pursuant to 20 CFR 416.920a(d)(1).

The ALJ found that Ms. Hughes's back and knee pain claims were not MDIs. (R. 21-22). As for her claim of back pain, the ALJ noted that, although Dr. Panagos's report indicates she underwent an MRI which purportedly showed conditions that would cause the back pain, the MRI itself was not in the record. (R. 21). Nor was an MRI ordered during her outpatient visit at Provident Hospital, even though the attending physician diagnosed her with right lower back pain, or on follow up visits. (R. 21). The ALJ also noted there was no deformity found by Dr. Panagos and range of motion was normal. (R. 21). Even though Dr. Panagos observed Ms. Hughes could not ambulate more than fifty feet without a cane, the ALJ said the lack of abnormalities in the "neurologic examination" was to the contrary. (R. 21). As further support, the ALJ noted that at the examination by Dr. Phillips, Ms. Hughes took the bus to the exam, her

posture and gait were normal, she did not have a cane, and she did not mention back pain. (R. 22). Lastly, Ms. Hughes did not bring her cane to the hearing. (R. 22). In light of all this evidence, the ALJ determined that the claims of back pain were not connected to a MDI. (R. 22).

As for why the claim of knee pain was not connected to a MDI, the ALJ cited to reports of Ms. Hughes "demonstrat[ing] full range of motion in all joints." (R. 22). The ALJ also noted that x-rays "showed no fractures or dislocations [of, as well as] normal joint spaces [in]" her knee. (R. 22).

In the third step of analysis, the ALJ found Ms. Hughes did "not have an impairment or combination of impairments [to] meet[] or medically equal[] the severity of one of the listed impairments [under] 20 CFR Part 404, Subpart P, Appendix 1." (R. 22). The evidence of severity did not match the regulatory requirements. (R. 22).

In the fourth step, the ALJ determined Ms. Hughes's residual functional functioning capacity assessment (RFC). (R. 23). The ALJ found that Ms. Hughes's RFC allowed her to perform light work while avoiding odors, fumes, dusts, gases, poor ventilation, and concentrated exposures to hazards. (R. 23). In support of the RFC, the ALJ "considered all symptoms."

The ALJ did not give much weight to the function reports of Ms. Hughes or her daughter, claiming that they were substantially similar and were not supported by the evidence in the record as a whole. (R. 24). Further, the ALJ found that Ms. Hughes's MDIs "could reasonably be expected to cause the alleged symptoms; however, [Ms. Hughes's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the [RFC]." (R. 24). In support of this, the ALJ cited Ms. Hughes's lack of—or poor compliance with—treatment and a lack of objective medical evidence regarding limitations as reasons that Ms. Hughes was not credible. (R. 24). Further, the ALJ found that Ms.

Hughes, because she was treated for sleep apnea at Stroger Hospital, was aware of low- or no-cost care for qualified individuals in spite of her claims of not being able to afford treatment. (R. 24).

In light of Ms. Hughes's COPD, the ALJ found that Ms. Hughes was limited to light work and should avoid odors, fumes, dusts, gases, and poor ventilation. (R. 24). The ALJ noted medical findings in the record that appeared to limit the effect of the COPD on Ms. Hughes and her current lack of medication. (R. 24).

The ALJ determined that Ms. Hughes's diabetic retinopathy meant that she should avoid a concentrated exposure to hazards, claiming that the loss of vision "did not appear to be significant" based on the underlying medical evidence. (R. 25). The ALJ did not find any other complications from diabetes other than retinopathy. (R. 25).

The ALJ noted that Ms. Hughes was not taking medication or otherwise receiving treatment for her irritable bowel syndrome, but found that the allegation of increased bathroom use still contributed to a limitation "in her exertional capacity." (R. 25). The ALJ found this condition would also limit Ms. Hughes to light work. (R. 25).

The ALJ found that Ms. Hughes's sleep apnea contributed to the limitation of light work and the avoidance of exposure to hazards. (R. 26). The ALJ made this finding despite the fact she found Ms. Hughes's claims not credible due to "non-compliance with treatment and failure to seek treatment," her reasons for the non-compliance were not credible either, and her symptoms would improve with CPAP usages. (R. 26).

The ALJ noted that Dr. Dow's recommendation was Ms. Hughes should be limited to light work and avoid odors, fumes, dusts, gases, poor ventilation, and hazards. (R. 26). The ALJ did note that Dr. Dow did not credit Dr. Carlton's assessment that Ms. Hughes could lift only 20

pounds, but the ALJ gave more weight to Dr. Carlton's assessment "because it is more consistent with the record." (R. 26). The ALJ did not explain why Dr. Carlton's assessment was more consistent with the record. (R. 26).

Finally, in the last step of the analysis, the ALJ determined Ms. Hughes was capable of performing past relevant work as a school assistant or security guard because her RFC did not prevent her from performing the activities related. (R. 26). The ALJ found that these prior jobs required her to be "at a less than sedentary exertional level" because she could walk for one hour, stand for thirty minutes and sit for five hours. (R. 26). Ms. Hughes claimed that, while at these jobs, she never lifted more than ten pounds, nor was she required to kneel, crouch or crawl. (R. 26-27). These positions also did not require supervisor duties, either. (R. 27).

Because of the foregoing, the ALJ determined that Ms. Hughes was not under a disability since the date she filed her application on July 30, 2010. (R. 27).

## IV. DISCUSSION

### A. The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one in which the court plays an "extremely limited" role. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is the duty of the ALJ, not the court, to weigh the evidence, resolve material conflicts, and make independent findings of fact. *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516

F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder*, 529 F.3d at 414; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for her decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This formulation repeatedly appears in the cases. *See e.g., King v. Barnhart,* 66 Fed.Appx. 65, 69 (7th Cir.2003); *Munoz v. Barnhart,* 47 Fed.Appx. 770, 773(7th r.2002)(Posner, Easterbrook, Manion, JJ.); *Garfield v. Schweiker,* 32 F.2d 605, 609 (7th Cir.1984)(Posner, Wood, Flaum, JJ.).

Although the ALJ need not address every piece of evidence, the ALJ cannot limit her discussion to only that evidence that supports her ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of her findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It has also called this requirement a "lax" one, but the ALJ must still rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544-45.

## B. The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) Is the plaintiff currently unemployed (in other words, has the plaintiff engaged in "substantial gainful activity");

2) Does the plaintiff have a severe impairment;

3) Does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) Is the plaintiff unable to perform his past relevant work; and

5) Is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512–13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005).

An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.(R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.(R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352; *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C. Analysis

Four reasons require reversal of the ALJ's decision. First, the ALJ impermissibly "played doctor" in assessing the evidence and Ms. Hughes's claims. Second, the ALJ did not sufficiently explain why the opinions of Drs. Hudspeth and Phillips were not credible. Third, the ALJ did not

properly resolve a conflict in her assessment of Ms. Hughes's residual functional capacity. Lastly, the ALJ improperly assessed Ms. Hughes's credibility.

## 1. The ALJ "Played Doctor"

The ALJ's first error was "playing doctor" in her evaluation of the medical evidence. An ALJ's decision must be based on the record before her, meaning the testimony and the medical evidence. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996). The ALJ can reject medical evidence even if it is based solely on a claimant's subjective complaints or if there is other medical evidence that conflicts with it. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999). The ALJ is under no obligation to give any particular weight to non-treating physicians. *Filus*, 694 F.3d at 868. However, just as the court is not allowed to substitute its judgment for that of the ALJ, the ALJ may not substitute her judgment for that of a medical professional by coming to medical conclusions not supported by the record. *Rohan*, 98 F.3d at 970; *Herron*, 19 F.3d at 334 n. 10 ("[A]n ALJ cannot make an independent medical finding"). "[P]laying doctor [is] a clear no-no, as [the Seventh Circuit has] noted on numerous occasions…" *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014).

In the second step of her analysis—the determination of Ms. Hughes's impairments—the ALJ found Ms. Hughes suffered from four MDIs, but also found that one was non-severe: depression. (R. 17-18). The ALJ determined, "based on the totality of the medical evidence in the record," that Ms. Hughes's claims of severity were not credible because they conflicted with the evidence in the record. (R. 18). These findings could be perfectly fine as long as the ALJ builds the "logical bridge" from the evidence to the conclusion. *See Sarchet*, 78 F.3d at 307.

Where the ALJ erred, however, is her unsupported opinion that the catalyst for Ms. Hughes's depression, "a lack of work," is the only reason for the continued experience of

depression, and that any depression would somehow "resolve itself" if Ms. Hughes were to return to work. (R. 18). The ALJ cites nothing in the record to sufficiently support why returning to work would cause Ms. Hughes's "medically determinable condition," (R. 17), to suddenly vanish. The ALJ does cite Dr. Phillips's examination that found Ms. Hughes's depression began when she lost her job at Chicago State. (R. 19, 420, 422). In addition, Dr. Phillips indicates her "feelings of uselessness" and missing "positive self-affirmations" were attributable to a lack of work. (R. 19, 420, 422). He also noted that these continued feelings were affecting her quality of life. (R. 422). However, nothing in Dr. Phillips's diagnosis states that lack of work is the *sole reason* for her depression and would therefore "resolve itself" upon employment. (*See* R. 420-23). In fact, not one evaluation in the record states this conclusion.

An ALJ must expressly rely upon evidence when she concludes that a certain activity contradicts a diagnosis of depression that affects a claimant's ability to work. *See Rohan*, 98 F.3d at 970; *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995). *Rohan* is instructive: there, the ALJ "indulged his own lay view of depression" for that of the evaluating physician. 98 F.3d at 971. The Seventh Circuit has repeatedly held that there must be a "sufficient articulation" in the ALJ's reasoning that he or she considered the most important evidence. *See Giles ex. rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007); *Conrad v. Barnhardt*, 434 F.3d 987 (7th Cir. 2006); *Brooks v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996). *Rohan* found there was a lack of a "sufficient articulation" for why the ALJ reached the conclusion he did, other than his own opinion about how depression operates. 98 F.3d at 971. Because of that, the court reversed and remanded. *Id.*

Here, the ALJ came to a medical conclusion about how Ms. Hughes's depression would "resolve itself" if she returned to work *without citing to a medical authority in the record*. (R. 18). The ALJ cannot use, as a reason to deny a claim, a hypothetical course of treatment that may

successfully allow a person to return to work if it is not found in the record. *Wilder*, 64 F.3d at 337. Both the diagnoses of Dr. Phillips and Dr. Morrin, whom the Agency used to obtain a mental status evaluation of Ms. Hughes (R. 364), include an Axis I diagnosis of depression, but did not include any Axis IV factors. (R. 368, 423). In Multi-axial diagnoses, any "psychosocial and environmental stressors that may affect the diagnosis, treatment, *and prognosis* of mental disorders" including a "negative life event" would normally, "in practice," be placed in Axis IV. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION ("DSM IV"), 29 (1994) (emphasis added).[2] The DSM IV allows for clinicians to include Axis IV factors earlier than the previous year if they "clearly contribute to the mental disorder or have *become the focus of treatment*." DSM IV, 29 (1994) (emphasis added). Since neither Dr. Phillips nor Dr. Morrin placed any factors in Axis IV, it is impossible to say what they thought clearly contributed to Ms. Hughes's depressive disorder or what factors would become the focus of any treatment, and there is nothing in the record indicating what would be the possible course of treatment. (*See* R. 367-68, 420-423).

There is an Axis IV diagnosis in Ms. Hughes's treatment plan from the community mental health center, listing "economic problems," R. 288, but that plan was not cited by the ALJ, nor is it probative of whether Ms. Hughes's return to work would resolve her depression. "Economic problems" can encompass many things, be it lack of employment, or a large amount of debt, or even a simple anxiety about having enough money to live. Having a job does not mean these problems will go away on their own; one can have a job that does not pay enough to

---

[2] The DSM IV was superseded by the Fifth Edition ("DSM V") in 2013 and the Multi-axial Assessment method was abandoned by the new edition. Dr. Morrin's evaluation of Ms. Hughes, however, occurred in 2010 when the Multi-axial Assessment of the DSM IV was still standard industry practice. Moreover, the DSM IV is still accepted in the industry and will not be obsolete until October 1, 2015. *See* American Psychiatric Association, *Frequently Asked Questions about DSM-5 Implementation- For Clinicians*, 1-2 (2014), available at http://www.dsm5.org/Documents/FINAL%20FAQ%20for%20Clinicians%20PDF%2010-7-14.pdf (noting that ICD-9 codes relied upon by the DSM IV will be accepted by insurance companies until October 1, 2015).

make ends meet. In other words, these "problems" are not inherently tied to the idea that simply having a job will make someone less anxious or depressed – or sufficiently so.

What is clear, however, is that the ALJ substituted her lay opinion of the causes and cures of depression for that of medical personnel. *See Rohan*, 98 F.3d at 971. In other words, she provided an Axis IV finding where no doctor had done so. ALJs are legal professionals, not doctors. *See Goins*, 764 F.3d at 680; *Blakes ex rel. Wolfe v. Barnhardt*, 331 F.3d 565, 570 (7th Cir. 2003); *Rohan*, 98 F.3d at 970; *Herron*, 19 F.3d at 334 n. 10. Yet, the ALJ here made an independent medical finding in the absence of any medical support. If Dr. Phillips or Dr. Morrin included an Axis IV factor of "loss of work" in their diagnoses—or had there been anything in the record indicating that returning to work would be a viable course of treatment—the ALJ could have had a basis to make the conclusion she did. She could have said that, in providing an Axis IV factor that was more than a year old, Dr. Phillips or Dr. Morrin must have felt that it would be the focus of any treatment and therefore relevant to any predictions of what would resolve Ms. Hughes's depression. *See* DSM IV, 29 (1994). But Drs. Phillips and Morrin did not do so.

The Commissioner argues that Ms. Hughes mischaracterizes the statement of the ALJ. (Def.'s Mem. in Support of Mot. for Summary Judgment, Docket # 18 (hereinafter "Commissioner's Brief") at 12). The Commissioner states this was a "reflection of [Ms. Hughes's] own statement to Dr. Phillips" that the cause of her depression was a lack of work. Commissioner's Brief at 12. Moreover, any implication that the ALJ thought Ms. Hughes would be "cured" by returning to work ignores the discussion and findings in the ALJ's assessment, which the Commissioner describes as "proper." Commissioner's Brief at 12.

The Commissioner's argument mischaracterizes the ALJ's decision. The ALJ did not simply identify the genesis of Ms. Hughes's depression as one more fact on the pile used to determine her claims were not credible. Instead, the ALJ took it upon herself to opine that "[Ms. Hughes's] reported cause of depression, a lack of work, would resolve itself if she were to return to work." (R. 18). This is not a factual finding, but a conclusory statement. The ALJ deduced that a MDI would disappear if a certain condition were met and concluded the impairment was not severe, but offered no sufficient reason as to why the impairment would go away and cited no authority, or medical evidence to buttress her *ipse dixit*.

Moreover, insofar as the ALJ relied upon Ms. Hughes's statement to Dr. Phillips as support for her conclusion about how Ms. Hughes's depression would resolve itself, Commissioner's Brief at 12, the statement only identifies when the depression began, not how best to treat it or what would resolve it. Ms. Hughes was not a doctor treating herself, but a claimant describing her medical history. (R. 420). Under the "sufficient articulation" standard, the ALJ cannot take a statement of the claimant to a medical professional and then say her depression will go away upon the condition being removed without having it backed up by medical opinion or evidence in the record. *See Rohan*, 98 F.3d at 970; *Wilder*, 64 F.3d at 337. Playing doctor alone could possibly be enough for reversal. *See Goins*, 764 F.3d at 682. Even if it is not, though, the ALJ's improper medical opining colors the rest of the decision.

## 2. The ALJ did not explain why medical opinions were not credible.

The second reason for reversal is the ALJ did not sufficiently explain why she found the opinions of Drs. Hudspeth and Phillips not credible. The ALJ is required to consider all the evidence in the record and to address the evidence which supports her conclusion as well as the evidence that undermines the conclusion. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001)

("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original) (internal quotation marks omitted). There must be a "logical bridge" between the evidence analyzed and the conclusion of the ALJ and a sufficient explanation why contrary evidence does not persuade. *Sarchet*, 78 F.3d at 307; *Berger*, 516 F.3d at 544-45. The ALJ cannot use the evidence that supports her conclusion and ignore the rest, but must consider and address "all relevant evidence." *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009). The Commissioner cannot advance a *post hoc* rationalization for rejecting evidence that the ALJ did not rely upon in her own opinion. *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

In terms of mental health, it is psychiatrists and psychologists who are the mental health professionals and experts, not ALJs. *Wilder*, 64 F.3d at 337. A disinterested mental health professional's evaluation and diagnosis is "entitled to considerable weight" if it is uncontradicted by the other medical opinions in the record. *Id.*; *Scivally v. Sullivan*, 966 F.2d 1070, 1076 n. 5 (7th Cir.1992). This evidence is not necessarily conclusive, but the ALJ cannot rely upon evidence to contradict the expert's opinion unless she gives a sufficient articulation of why it does so. *Wilder*, 64 F.3d at 337. Results of tests or observations in the report of the medical professional used to discredit a professional's conclusion must also relate to the illness at issue. *See Id.* ("[T]here is no reason to expect a doctor [will ask] about an eye problem, or back pain, or an infection of the urinary tract to diagnose depression.").

As an initial matter, the court must address the Commissioner's argument that none of the evidence from the previous denial of benefits can be relied upon by the Plaintiff "to contradict evidence originating during the time period at issue." Commissioner's Brief at 5, n.1. As support

for this assertion, the Commissioner claims the evidence of the prior denial is precluded by *res judicata*, Commissioner's Brief at 3, but the ALJ never applied *res judicata* to bar the evidence from the previous application. Administrative *res judicata* is a discretionary matter and the ALJ must apply *res judicata* if she wishes to bar the evidence from a prior decision. *Johnson v. Sullivan*, 936 F.2d 974, 976 (7th Cir. 1991). If not, the earlier decision is constructively reopened, and any claim of administrative *res judicata* is waived, if the ALJ renders a decision on the merits of the second application based upon the entire record. *Id. See Byam v. Barnhart*, 336 F.3d 172, 180 (2d Cir. 2003); *Kasey v. Sullivan*, 3 F.3d 75, 78 (4th Cir. 1993). Here, the ALJ made no mention of *res judicata* and made her findings "based [up]on *the totality of the medical evidence in the record*." (R. 17) (emphasis added). Any claims of *res judicata* have been waived and Ms. Hughes can rely upon the evidence from the previous denial of benefits to undermine the ALJ's decision.

Moreover, the opinions of Drs. Hudspeth and Morrin were both based upon the records from the community mental health center, the evidence that the Commissioner says that the ALJ rejected. (R. 352, 381). If the ALJ intended to reject or limit the evaluations of Hudspeth and Morrin on the basis the Commissioner suggests, she would have done so—but she did not. The Commissioner cannot advance a *post hoc* rationalization that the ALJ did not rely upon in her own opinion. *Jelinek*, 662 F.3d at 812. The ALJ does not claim that the evidence dated prior to Ms. Hughes's previous denial of SSI could not be considered pursuant to *res judicata,* and it cannot now be used by the Commissioner as a basis for rejecting the medical records or the evaluation of Dr. Hudspeth. *Id.*

Further undermining the Commissioner's argument is the fact that Dr. Morrin reviewed documents from outside the purported "time period at issue," but the ALJ did not give "slight

weight" to her conclusions as she did with Drs. Hudspeth and Phillips. (*See* R. 18-19). If the ALJ truly rejected any evidence from before the previous denial of benefits, she would have afforded the same weight to Dr. Morrin's evaluation as that of Drs. Hudspeth and Phillips.

The Commissioner relies on *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005), to support the theory that anything from the previous denial of SSI cannot be used later, Commissioner's Brief at 5, n.1, but this reliance is misplaced. The claimant in that case did not offer *any* evidence regarding her medical condition prior to the "time period at issue" to either support or discredit her claim for SSI for relevant time period. *Sienkiewicz*, 409 F.3d at 802. The *Sienkiewicz* court did not hold that prior evidence from an earlier denial of SSI could not be used to support a later claim for SSI. *Id.* More to the point, however, is the fact the ALJ claimed to have reviewed the evidence presented in its entirety and she did not give any explanation why that evidence did not support Ms. Hughes's claim of depression. (R. 17).

Dr. Hudspeth concluded that Ms. Hughes had moderate limitations in her ability to interact appropriately with the public and to respond to changes or handle detailed instructions. (R. 392-93). The ALJ accorded Dr. Hudspeth's evaluation "slight weight" because "the medical evidence did not support her opinions" (R. 20). The ALJ listed Ms. Hughes's ability to maintain relationships with her family and friends, as well as her ability to ride public transportation as evidence that Dr. Hudspeth's evaluation was not supported. (R. 20). The ALJ does not, however, sufficiently explain why this evidence undercuts Dr. Hudspeth's opinion. As part of her decision, the ALJ must build an accurate and logical bridge from the evidence to her conclusions. *Sarchet*, 78 F.3d at 307. But the ALJ does not state why existing, long-term relationships with friends and family are sufficient to show that Ms. Hughes can appropriately interact in new situations with the general public. (*See* R. 20).

Further, even though Ms. Hughes can take public transportation, there is no indication that she was able to interact with others in a work setting. It is not apparent why this evidence contradicts the findings of Dr. Hudspeth, and the ALJ did not explain why the ALJ thought it did. *See Herron*, 19 F.3d at 333. In other words, it is not enough for the decision to point to evidence in the record and ask the reviewing court to make the connections; reasons must be given. *Sarchet*, 78 F.3d at 307. *See Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) ("It is more than merely 'helpful' for the ALJ to articulate reasons… for crediting or rejecting particular sources of evidence. It is *absolutely essential* for meaningful appellate review") (emphasis added).

The ALJ also claimed that "attentiveness within normal limits" was undermining of Dr. Hudspeth's evaluation in the face of other evidence that would seem to support her conclusion that Ms. Hughes had a limitation. (R. 20). This evidence included findings of sadness, anxiety, flat affect, thoughts of death, depression, auditory and visual hallucinations, feelings of helpless and hopelessness, decreased appetite, and suicidal ideation. (R. 322, 352, 354-55, 364, 415-16, 420). The ALJ did note that limitations in certain activities were caused by dozing off, which is a symptom of sleep apnea. (R. 18). It is not clear from the decision, however, that the ALJ found that sleep apnea was the cause of the symptoms listed above. An ALJ cannot use the evidence that only supports her conclusion and ignore the rest; she must consider and address "all relevant evidence." *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009). Moreover, insofar as sleep apnea is what the ALJ relied upon in rejecting this evidence, there was no sufficient explanation for why this made Dr. Hudspeth's opinions inconsistent with the record as a whole. *See Sarchet*, 78 F.3d at 307; *Zblewski*, 732 F.2d at 79.

The Commissioner argues that evaluations of non-examining psychologists like Dr. Hudspeth do not demand any significant weight. Commissioner's Brief at 5 (*citing Filus*, 694 F.3d at 868). Dr. Hudspeth's opinion, as a non-examining source, is not to be given automatic weight or deference by an ALJ. The question is whether the medical evidence supports the conclusions or if there are other expert opinions in the record that contradict the opinion at issue. *Filus*, 694 F.3d at 868. *See also Schmidt*, 496 F.3d at 843. As explained above, there was no sufficient explanation of why evidence did not support Dr. Hudspeth's conclusions. Further, the other medical opinions in the record are consistent with, and do not directly contradict, Dr. Hudspeth's. (*See* R. 422).

Dr. Phillips, based on his clinical examination, found that Ms. Hughes had a history of anxiety and depressive symptoms that led to these impairments, which have, in turn, lessened her quality of life. (R. 420). The ALJ did not give his conclusions of impairments in "social, occupational and interpersonal functioning" more than "slight weight" because they were not supported by Ms. Hughes's statements at the examinations, nor Dr. Phillips's "objective observations." (R. 19). These statements and observations included Ms. Hughes's neat dress, normal speech, ordinary thought content, regular motor movements, her identification of a news item, identification of previous presidents and cities, performance of basic math tests, adequate abstract thinking, and unimpaired cognitive function. (R. 19). The ALJ also noted that Dr. Phillips did not list "significant abnormalities" other than dysphoric affect. (R. 19).

Again, as with Dr. Hudspeth, the ALJ fails to explain *why* the findings contradict Dr. Phillips's Axis I diagnoses of "Major Depressive Disorder, recurrent, moderate," and anxiety. (R. 423). She lists the statements and observations and then concludes they do not support the conclusions. (R. 19). As there are no other examinations in the record that contradict Dr.

Phillips's diagnoses, the ALJ was required to give considerable, not slight, weight to his conclusions, unless there is persuasive evidence that is in direct contradiction. *Wilder*, 64 F.3d at 337.

Here, as in *Wilder*, the statements and observations relied upon by the ALJ are not compelling. In *Wilder*, the medical records the ALJ relied upon "were of purely physical ailments," and there was no reason to believe that the methods the doctors use would indicate signs of depression. 64 F.3d at 337. Just as nobody would expect observations about someone's eyes or back to suggest that person is not depressed, *id.*, it is not obvious why naming past presidents or correctly adding up enough nickels to $1.15 undermines a diagnosis of depression and anxiety by a qualified medical professional. (*See* R. 19). Of course, the observations listed by the ALJ are intended to evaluate mental functioning, not physical, so it is possible these observations could indeed contradict Dr. Phillips. It is not, however, self-evident that someone who, for instance, is demonstrating good cognitive function cannot also be suffering from depression and anxiety that puts, as Dr. Phillips says, an "impairment in social, occupational and interpersonal functioning…[that] render[s] her quality of life less than optimal." (R. 423).

Moreover, the ALJ also ignored evidence that could have supported Dr. Phillips's diagnoses—such as family history of depression, "down" mood, "passive suicidal ideation," feelings of uselessness, a prescription for Zoloft, and worry over health and finances. (R. 420-23). *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1. Listings 12.00. Even though the ALJ did say there were no other "significant abnormalities" other than a dysphoric affect, (R. 19), Dr. Phillips did not say this was the only significant abnormality that led to his diagnosis. (R. 420). This notion that there were no other "significant abnormalities," without reference to what is a significant abnormality, borders on the ALJ's own opinion as to what constitutes a significant abnormality,

leading to the suspicion that she substituted the opinions of medical professionals for her own, which is not permitted. *See Rohan*, 98 F.3d at 970; *Herron*, 19 F.3d at 334 n. 10; *Goins*, 764 F.3d at 680.

Regardless of whether she played doctor in this instance, the ALJ was required to at least address the evidence that cuts against her conclusions and explain why it does not outweigh the evidence she relied on. *Zurawski*, 245 F.3d at 888. The ALJ must examine the evidence that relates to the claim as a whole and investigate "all avenues presented." *Id. See generally* 20 C.F.R. § 404.1527(c)(4) (opinions that are determined to be consistent with the record as a whole are given more weight). The decision does not examine the "objective observations" of Dr. Phillips that support his conclusions and also does not give an argument as to why those observations are outweighed by those cited by the ALJ. (*See* R. 19). Instead, the ALJ dismisses any other possible abnormalities as not "significant" without much explanation. (R. 19).

Finally, the court must take into account the ALJ's error of "playing doctor" when it came to the causes and cures of Ms. Hughes's depression. This raises serious doubts about whether the ALJ properly considered the opinions of Drs. Hudspeth and Morrin in the first place or if she was trying to fit the evidence into a predetermined outcome.

Other parts of the opinion raise concerns as well. For example, there is the boilerplate or template language seen all too often in these cases: "After careful consideration of the evidence, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 24). This language has been routinely, consistently, and severely criticized by the Seventh Circuit. *See e.g. Moore v.*

*Colvin*, 743 F.3d 1118, 1122 (7th Cir. 2014); *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010). It "shoehorns the evidence into a foregone conclusion." *Filus*, 694 F.3d at 868. *See also Shauger*, 675 F.3d at 696 ("[T]his boilerplate... backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility.") The continued efforts of the Court of Appeals to quash out this flawed boilerplate are reminiscent of Hercules's Second Labor with the Lernaean hydra. *See* APOLLODORUS, THE LIBRARY 189 (Sir James George Frazer trans., G.P. Putnam's Sons 1921) ("Nor could he effect anything by smashing [the hydra's] heads with his club, for as fast as one head was smashed there grew up two.").

Ms. Hughes also claims the ALJ erred in not including limitations in the RFC due to her depression. Because the ALJ did not sufficiently explain why the limitations recommended by the mental health professionals were credible, it follows that not including those limitation in the RFC was also erroneous.

### 3. The ALJ did not properly resolve a conflict in the assessment of the RFC.

The third reason for reversal is that the ALJ did not properly resolve a conflict in her assessment of Ms. Hughes's RFC. The ALJ is under a duty to resolve conflicts of medical experts in the record. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). *See also Zurawski*, 245 F.3d at 888; *Luna*, 22 F.3d at 691. In *Golembiewski*, the court reversed an ALJ's decision in part because he did not resolve a conflict over the claimant's ability to bend over. 322 F.3d at 917. The court noted that this was a critical oversight as an ability to occasionally bend over is required "in order to perform light work." *Id.*

Here, Dr. Panagos opined that Ms. Hughes could not walk more than fifty feet without a cane. (R. 417). Yet, Dr. Carlton offered a conflicting opinion, stating she could walk greater than fifty feet without assistance. (R. 353, 356). The ALJ, however, did not resolve the conflict, nor did she address it. (*See* R. 23-26). Moreover, as in *Golembiewski*, the evidence here was not from a MDI, but the conflicting assessments of medical professionals. 322 F.3d at 917. Even in the absence of MDIs, the ALJ must still address conflicting opinions on the limitations of the claimant for the purposes of the RFC. *See id. See also Terry*, 580 F.3d at 477 ("[A]n ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation"). This conflict should have been addressed by the ALJ in Ms. Hughes's RFC, but was not and therefore reversal is warranted.

### 4. Ms. Hughes's Credibility

Ms. Hughes asserts four instances where the ALJ improperly assessed her credibility: her recent lack of medical treatment for depression, conflicts between her claims and mental examinations, insufficient evidence to substantiate Ms. Hughes's claims of back pain, and the fact she could engage in a range of activities that appeared to be inconsistent with her claims. In typical situations, credibility assessments receive "special deference," because the ALJ observes the claimant testifying. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). An ALJ's determinations will be overturned only if they are "patently wrong." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). To show that they were, the claimant must do more than just point to different conclusions the ALJ *could* have made. *Jones*, 623 F.3d at 1162. However, when the credibility determinations of the ALJ *do not* rest on the testimony of the claimant, but rather on "objective factors," courts have "greater freedom" in their review of the ALJ's decision. *Herron*, 19 F.3d at 335 (citing *Anderson v. Bessemer City,* 470 U.S. 564, 574 (1985)).

The first instance that Ms. Hughes cites is the ALJ's finding that a "recent lack of medical treatment" and "poor compliance" with that treatment show that Ms. Hughes's claims of depression were not credible. (R. 18, 24). Curiously, the ALJ credited Ms. Hughes with seeking treatment up until July 2012, when her community mental health clinic closed down. (R. 18, 20). This means the ALJ found Ms. Hughes to not be credible even though she sought treatment for a full two years after filing her application, but had a lapse in treatment of five months. To support this conclusion, the ALJ cites Ms. Hughes's treatment at Stroger Hospital for sleep apnea as evidence that she was on notice of free or low-cost mental health services provided there. (R. 24).

An ALJ, however, cannot rely upon assumptions to create negative inferences about a claimant's lack of medical treatment. *Roddy v. Astrue*, 705 F.3d 631, 638-39 (7th Cir. 2013); *Shauger*, 675 F.3d at 696. Instead, the ALJ must question the claimant at the administrative proceeding about any gaps in treatment to see if there is a good reason for the lapse. *Id.* "Good reasons may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects." *Id.* At the administrative hearing, Ms. Hughes explained that she was seeing a Dr. Bell for her depression until the community mental health center closed down. (R. 40). She also explained she stopped taking Zoloft because her prescription from Dr. Bell had run out, but she was going to get a new prescription from her internal medicine doctor. (R. 40). The ALJ did not inquire about Ms. Hughes's sleep studies at Stroger, nor did the ALJ ask if she was aware of the free or low-cost mental health services at the hospital. (*See* R. 34-53). Instead, the ALJ speculated Ms. Hughes knew about the services at Stroger hospital. (R. 24). An ALJ cannot rely upon her own assumptions or speculations to determine a claimant's credibility. *See Roddy*, 705 F.3d at 638-39; *Shauger*, 675 F.3d at 696.

Moreover, simply being aware of certain services or products supplied by a "vendor" does not mean that one is aware of *all* services or products provided. For example, one can know that a coffee shop sells discounted brewed coffee to low-income families, but not know that the same low-income families can get free coffee mugs on Tuesdays unless they are informed by the people working behind the counter. Stroger is a large facility with many different departments. The sleep apnea test of Ms. Hughes no doubt was handled by personnel in a different department than the department with mental health professionals. The sleep apnea personnel would also have no reason to inform Ms. Hughes of the mental health services at the hospital because she was there for a completely different reason, and they would not be looking for signs of depression. *See Wilder*, 64 F.3d at 337.

Regardless of whether Ms. Hughes was aware of the mental health services at Stroger Hospital or not, the ALJ did not sufficiently articulate why Ms. Hughes's claim was not credible when she sought treatment for more than two years, but stopped for only five months. (R. 18). Further complicating the issue is that Ms. Hughes's treatment ended because her treating facility closed. (R. 20). The Commissioner argues the ALJ determined that Ms. Hughes found further treatment unnecessary after the facility closed. Commissioner's Brief at 11. But the conclusion does follow from the premise. Moreover, the ALJ did not make this finding in the decision, and there is no evidence to suggest that Ms. Hughes was aware of all of the services at Stroger Hospital.

Further, the ALJ must consider whether non-compliance with medical treatment is a result of mental illness. *Kangail v. Barnhart,* 454 F.3d 627, 630 (7th Cir. 2006). Ms. Hughes was deemed to have a MDI of depression, a mental illness. The ALJ did not consider whether this mental illness was a factor in her not seeking treatment. Because the credibility determination

was based upon "objective factors," and not the testimony of Ms. Hughes, the ALJ's determination is not entitled to special deference. *Herron*, 19 F.3d at 335. The error in the ALJ's decision was significant.

The second reason the ALJ did not find Ms. Hughes credible was "normal mental status examinations while under treatment." (R. 18). The ALJ can reject medical evidence if it is based solely on a claimant's subjective complaints or if there is other medical evidence that conflicts with it. *Filus*, 694 F.3d at 868; *Johnson*, 189 F.3d at 564. However, the ALJ must build the logical bridge from the evidence to the conclusion. *Sarchet*, 78 F.3d at 307. Part of this logical bridge is to explain why certain evidence, such as statements to medical examiners, that contradicts any conclusions is outweighed by the evidence that supports the conclusions. *Zurawski*, 245 F.3d at 888; *Luna*, 22 F.3d at 691. The ALJ claimed that Ms. Hughes's "cooperative" presentation and "euthymic" appearance were consistent throughout these examinations and that she denied suicidal ideation. (R. 18). However, Ms. Hughes did make other statements that conflicted with the ALJ's determination. For example, Ms. Hughes *did* claim to have suicidal ideation to the community mental health center and Dr. Phillips (R. 282, 284, 420). The ALJ did not explain why the statements that Ms. Hughes made to the examiners were outweighed by the evidence that supported her conclusions. As with the first reason, this credibility determination was based on "objective factors" instead of the testimony of Ms. Hughes and is therefore not entitled to special deference. *Herron*, 19 F.3d at 335.

The third reason the ALJ found Ms. Hughes not credible was the "lack of objective medical evidence" regarding her back pain. (R. 24). As discussed below in the next section, no medical professional diagnosed Ms. Hughes with a MDI that would lead to her back pain and

there was conflicting statements of Ms. Hughes as well as conflicting evidence in the record, which is the responsibility of the ALJ to resolve. *Richardson*, 402 U.S. at 399-400.

The fourth and final reason the ALJ found Ms. Hughes not credible was the "wide variety of activities" Ms. Hughes could engage in that were "inconsistent with her alleged level of disability." (R. 18). This "wide variety" included four activities: Ms. Hughes's ability to "watch[] television, decorat[e] when she could get money, talk[] on the phone every day, and go[] to church on a regular basis." (R. 18). The ALJ then claims these activities undercut her claims of depression, mentioning that the only limitation caused by her depression was paranoia. (R. 18).

It is not clear how these activities demonstrate that Ms. Hughes's claims of depression, and the alleged severity, are not credible. The Seventh Circuit has consistently warned ALJs not to equate limited activities with the capacity to hold down a full-time job. *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) ("[W]e have urged caution in equating [daily] activities with the challenges of daily employment in a competitive environment"); *Roddy*, 705 F.3d at 638-39 ("[A] person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time"); *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) ("We have remarked on the naiveté of the Social Security Administration's administrative law judges in equating household chores to employment"); *Bjornson*, 671 F.3d at 647 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons… and is not held to a minimum standard of performance… by an employer").

Watching TV, decorating, talking on the phone to relatives and going to church hardly indicate that Ms. Hughes's depression does not limit her in some way when it comes to the rigors and pressures of a work environment, nor do they clearly indicate that Ms. Hughes was not credible in "her alleged level of disability." (R. 18). Again, the ALJ cannot ask a court to make the connections between the evidence and the conclusions, but must do so herself by building the "logical bridge," *Sarchet*, 78 F.3d at 307, between the evidence and the conclusion. Something that was not done here.

The Commissioner argues that the ALJ "considered Plaintiff's [range of] activities… as one of many factors weighing against [her] credibility." Commissioner's Brief at 13. The Commissioner then argues that the ALJ's finding of Ms. Hughes's ability to go "shopping with her daughter, use[] public transportation *as needed*, care[] for her grand[son], and attend[] church" indicated that her claims of irritable bowel syndrome are not credible because they "do not reflect a need to compensate for unpredictable IBS symptoms, or symptoms due to other conditions." Commissioner's Brief at 13 (emphasis added).

The Commissioner's argument is not convincing. First, the ALJ actually gave Ms. Hughes "some benefit of the doubt concerning her allegations of increased bathroom use." (R. 25). Second, none of those activities truly demonstrate that Ms. Hughes did not have to "compensate for increased bathroom use." Shops and churches can, and do, have bathrooms. Ms. Hughes watches her grandson while at home, where a bathroom is available. Additionally, caring for family members has been cited by this Circuit as not necessarily sufficient for demonstrating that someone can handle the pressures of a job. *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) ("[W]e have urged caution in equating [daily] activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member."). Moreover, the mere fact that she took public transportation "as needed" does little to illustrate how her claims were not credible. There

was no evidence that these were hours-long bus rides with no access to a toilet. Nor did any evidence suggest that Ms. Hughes did not plan her trips to keep them short or to make sure there were available bathrooms along the way. One can always get off a bus if necessary.

If these activities suggest someone who claims to suffer from irritable bowel syndrome is not credible, it is hard to see what would make claims of irritable bowel syndrome credible. People with irritable bowel syndrome do not need to be so limited in their activities that they cannot ever leave the house. *See generally Bjornson*, 671 F.3d at 647 (evidence that claimant could walk a block, bathe and dress normally and even drive was not discrediting because she never claimed she was immobile). The relevant question is whether it affects a claimant's ability to work, *see id.*, to which the ALJ answered "yes." (R. 25). *See Beardsley*, 758 F.3d at 838; *Roddy*, 705 F.3d at 638-39; *Hughes*, 705 F.3d at 278.

In deciding that Ms. Hughes's "wide variety of activities" indicated she was not credible, the ALJ did not build the logical bridge from the evidence to the conclusion by sufficiently explaining why the activities were inconsistent with her claims. *Sarchet*, 78 F.3d at 307. As with the first and second reasons, this credibility determination was based on "objective factors" instead of the testimony of Ms. Hughes and is therefore not entitled to special deference. *Herron*, 19 F.3d at 335. For the foregoing reasons, the ALJ erred in evaluating Ms. Hughes's credibility.

### 5. Ms. Hughes's claim of back pain

Ms. Hughes argues that the ALJ erred in determining her back pain was not from a MDI. While there are many objective clinical findings that could support a finding of a back impairment, there was also conflicting evidence in the record, such as normal range of motion in the spine and ability to get off and on the examining table without assistance. (R. 21-22). Further, there was no official diagnosis—other than "back pain" by Provident Hospital—that indicated Ms. Hughes suffered from a medical condition, nor was there any diagnostic imaging to support

the claim. (R. 21-22). There was substantial evidence for the ALJ to conclude that Ms. Hughes's back pain was not because of a MDI.

Ms. Hughes claims that Dr. Mallick diagnosed her with "degenerative joint disease of the spine" and "arthritis." Ms. Hughes points to Physical Therapist Laurie Webb's summary of Dr. Mallick's referral for her lower back pain as evidence she was diagnosed with these conditions. However, Dr. Mallick's report contains no such diagnosis. (*See* R. 403-04). Simply put, there was nothing in the record to indicate that Ms. Hughes's back pain, which could be real, was the result of a MDI. This was not an error by the ALJ.

## CONCLUSION

The Plaintiff's Motion for Summary Judgment is granted. The decision of the ALJ is reversed and the case is remanded.


**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**


**DATE:** 5/12/15